MEMORANDUM OF DECISION
On November 17, 1998, the Department of Children and Families, hereafter "DCF", filed petitions for the termination of the parental rights of Kelley B. to her four children. DCF also filed termination petitions against the respective biological fathers of these children; Dale C., , William McC., and Samson D. The CT Page 1437 trial on the termination petitions against the parents was held on December 13, 14 and 15, 1999. All biological parents were present with the exception of the father of the two oldest boys, Dale C. For the reasons stated below, the court grants the petitions for termination of the parental rights of Kelley B., the mother, and William McC., the father of William McC., because of their failure to rehabilitate themselves as parents of these children. The court also grants the petitions as to Dale C. and Samson D. on the grounds of abandonment and because each no longer has an ongoing parent-child relationship with his child. Connecticut General Statutes § 17a-112 (c)(3)(A), (B)and(D).
From the evidence presented, the court finds the following facts:
 A. FACTS 1. Kelley B., the mother.
A. Events prior to the neglect adjudication:
Kelley was just seventeen when her oldest child, Raymond, not subject of any of these petitions was born. Hers is a multi-generational history of neglect and abuse as she was removed from the care of her family and placed in foster care at age eight. After being in two foster homes, she was placed in residential care from age eleven to age thirteen. She has admitted to being physically and sexually abused by her father. She became pregnant when she was sixteen. She is now thirty years old and is the mother of five children, none of whom is presently in her care.
In her attempts to create her own family, unfortunately Kelley selected as partners, including the fathers of her children, men who had serious problems with domestic violence, substance abuse and sexual abuse as well as mental health issues. While a review of the facts concerning the fathers of the four youngest children, the subject of these petitions, will detail the unique qualities of each, the common threads of chaotic living situations, physical and sexual abuse as well as violence in the daily lives of the children while in the care of their mother became starkly apparent during the trial. The consequences of that chaos and violence are reflected most clearly in the behavior of the two older children, Dale and Mark, to a lesser extent William while not impacting young Samson at all. The extent and seriousness of the disturbances reflected in these children traces with particularity to the length of time each CT Page 1438 child was exposed to the chaotic and violent life led by their biological mother.
DCF received the fist referrals regarding Kelley in 1988, when her oldest son Raymond was just eighteen months old. Kelley then began to exhibit the behavior she has continued in her dealing with DCF in the ten years since that time. She acknowledged the seriousness of the allegations, that Raymond was at times unsupervised or being supervised by her father, a known child molester. But that acknowledgement and recognition of the issues did not lead to changes in her behavior, for after Dale was born, a second referral about the same issues was made in 1991. Unfortunately, a third referral for the same issue occurred in December of 1991, and Kelley moved out of the home where her father was present.
In 1994, DCF received the first referral regarding domestic violence. The agency confirmed that Kelley and Dale C., the father of Dale and Mark, were involved in physical fights with each other and physical disciplining of the children. At this point in time, an active case was opened and services provided. For a few months, Dale C. engaged in services and the physical violence at home ceased. The case was closed in May, 1994. Shortly thereafter, the biological father, Dale C., left the state of Connecticut, to return only briefly in the spring of 1995. He has lived in West Virginia since that time and has not been involved with his children.
It was after this that Kelley became involved with William McC., a known sexual offender. Upon learning this, DCF entered into a service agreement with Kelley requiring that any contact between Kelley's children and William McC. be supervised. In July 1995, Kelley's fourth child, William McC. was born. And shortly thereafter, DCF closed the case again, only to reopen it in December, 1995 based on allegations that Kelley and another boyfriend, not the father of any of these children, were fighting physically. At that time, there was a parent aide referred to the family, Kelley was involved with a support group and a battered woman's group as well as receiving anger management counseling. Dale and Mark were receiving the benefit of an early intervention program. In early 1996, Kelley's boyfriend was arrested for assault in the third degree and disorderly conduct. His arrest concerned his treatment of Kelley's oldest child Raymond, whom he pushed and when the child fell down, he put his foot to the child's head. A full protective order was issued and "Jay" did CT Page 1439 not return to the family home again.
In March 1996, Kelley became involved with the father of her fifth child, Samson D. DCF received a referral in April that Mark had wandered out of his yard at home and was found at a convenience store unsupervised. In June, there was a referral that Kelley and the children were living in an apartment without electricity. In July, Kelley stated to DCF that she would seek revenge on those who had made referrals about her in the past and she would "do herself in." She stated that there were "not enough cops in Danielson to control" her. In October, 1996, neglect petitions were filed. DCF became concerned during the course of that year about the repeated neglect issues in Kelley's treatment of her children, the ever-present domestic violence with partners known to have criminal records and Kelley's reluctance to engage in services. The plan at that time was to provide protective supervision to the family.
The DCF social worker responsible for the case during this time testified in detail about her first visit with the family in November, 1996. Samson was in and out of the home at that time. Kelley was in the apartment with all of her children and her young niece. Young Samson had not yet been born. She recalled that the children were playing in the bedrooms, when Mark came out of one of the bedrooms crying. He stated that his brother Dale had inserted a wooden spoon up his rectum. The worker met and interviewed each of the children in turn about this incident. Dale denied he did this to his younger brother but did talk about "making sex", explaining to the worker that "you pull your pants down and the penis is stuck in the rectum." At that time, Dale was six years old. He reported that his cousin Armand asked him to engage in "making sex." The worker also met with the oldest child, Raymond, who denied any sexual activities at all. When the social worker spoke to Kelley about this, Kelley relayed that her niece had a history of sexual activity. Kelley appeared to the worker to be more concerned about alleviating the blame from her own children and repeated that "her niece had this problem." In the same month, Kelley and Samson fought physically in the home in front of the children and Samson was arrested. A month following this incident, the children were adjudicated neglected on December 9, 1996 and left in the home under orders of protective supervision.
B. Events Post Neglect Adjudication after 12/9/96 CT Page 1440
Despite DCF involvement, the problems in Kelley's home persisted. In 1997, there were a total of 4 reports about domestic violence in the home. Kelley's youngest child, Samson D. was born on March 31, 1997. On May 29, 1997, both Kelley and Samson were arrested for domestic violence. An order of temporary custody was sought and granted and the children were placed in foster care. None of the four younger children have been in the care of their mother since that time. At the time in question, none of the biological fathers were actively involved with the children; Dale C. was in West Virginia, to the worker's knowledge, William McC. was incarcerated and Samson D. under a protective order to have no contact with Kelley or the children.
Prior to the date of the neglect adjudications, DCF had offered many services to Kelley, which she utilized only partially. In 1995, she was referred to a support group, a battered woman's group and anger management counseling. Also referred to the home were a parent-aide and both Mark and Dale received early intervention services. In 1996, Kelley was referred by DCF to counseling on four separate occasions. The specific steps provided to Kelley in December, 1996 required her to attend counseling, both individual and family counseling as well as parenting classes. The parenting classes were not completed until August of 1997. Kelley only partially complied with the expectations set for her. The Social Study, Petitioner's Exhibit 1, provides an exhaustive listing of the many referrals, Kelley's profanity and general disregard for DCF and its attempts to assist her, her confrontations with the many men in her life, other women and neighbors. The many events are too numerous to list in detail in the text of this opinion. The failure of these services to materially improve Kelley's behavior is borne out not only by her partial completion of them, but by future events which repeatedly demonstrated no change in her attitudes or behavior. She remained secretive, hostile to DCF and others in her life and unwilling to accept the social services she required.
The visitation monitor testified in detail about Kelley's visitation with her children. The monitor supervised visits of the four children with their mother from October, 1997 until December 2, 1999. Her job was to "transport the children, monitor the visits, provide parenting skills training and document what when on." She was to watch and make sure that the parents did not engage in any "inappropriate behaviors or discussions." She observed that Kelley interacted with her children only in a CT Page 1441 limited way. While Kelley was affectionate with her children, she typically did not get on the floor to play with them. The monitor also had numerous concerns about Kelley's ability and willingness to care for the safety of the children. She would not stand close to her children and monitor them. At times she would drift away from them so that the physical distance between her and the children made it unsafe for the children. The monitor gave specific examples of trips to the park to feed ducks when Kelley did not watch her children closely enough. The monitor also found that Kelley did not set socially appropriate boundaries for her children and did not follow through with the boundaries set when the children were not compliant with her directions.
There were several times where the monitor had to intervene to assure the safety of the children. She had to remove uncovered fans in the home when the children were there and had to stop Dale once when in the park he was walking by the rocks near the water and stepped on the rocks. He slipped and fell in and got wet up to his knees. "She found," she stated "when she spoke to Kelley about these various issues, Kelley would listen, but not change her behavior." Ms. Snyder stated that often Kelley was not ready and awake for the visits. She had to wake her in the morning as she was often asleep at 9 a. m. Also, on those occasions, Kelley would come to the door from being asleep and get in the car without any further preparation. She used inappropriate language around the children and would swear. This, too, did not change over time.
By early 1998, Dale and Mark became more and more resistant to visitation, acting out in particular after the visits with their mother. Dale stated he did not wish to see his mother. Based on these behaviors and the advice of their children's therapist, visitation between Dale and Mark and Kelley ended in November 1998.[2]
The visitation monitor also testified that at times Kelley was not always that focused on the visitation itself. In 1998, she asked DCF if she could involve a boyfriend in the visits. During the most recent visit on December 2, 1999 with her two youngest children, when she was offered the opportunity to take the children to a Macdonald's with a playscape, she chose a Macdonald's that had no such facility for the children. As the visit unfolded, Kelley was distracted and more concerned with speaking with an employee in whom she was interested. At one point during that visit, she got up and left the group to follow CT Page 1442 him to the men's rooms. Kelley told the monitor that she was attracted to him and "had a crush on him."
Suzanne Derry, a clinical psychologist, evaluated Kelley. The evaluation was completed in December 1998 and January 1999. Dr. Derry testified at trial and stated that "Kelley is a tense, explosive person who feels personally ineffective. She believes that others do not give her what they should and that she is powerless to avoid suffering at the hands of other people." She concluded that Kelley is:
 "basically a primitive individual who is preoccupied with her own emotional neediness. She is self-absorbed and has a limited awareness of others and how they are different from herself. She has only a limited ability to focus on external circumstances such as employment, homemaking and her children. She is unaware of her children's needs and sees them as emotional support for herself. She does not see them as having any difficulties. . . . She does not see herself or the children as in need of any assistance . . . she is never tired or irritable, they are ideal children, well-behaved, cooperative and devoted children."
She concluded that Kelley has no ability to be a parent in their day-to-day life in the near future. She found that Kelley did not see her children as individuals and that she is limited in her ability to develop strategies to help them. "She is without insight into her difficulties in her functioning as a parent." Dr. Derry concluded that it was in the best interests of the children to sever their connection to their mother.
The DCF social workers testified to the many men in and out of Kelley's life between 1996 and the present time, as well as her many moves. In 1998, there was Mark L., who Kelley knew had a violent criminal history. There was also an individual named Samuel in May 1998. When the social worker met with him, this person also admitted to a history of arrests. Apparently there was an incident between Kelley and Samuel on Mother's Day at the home. In August 1998, Kelley was evicted from her apartment and staying with a James P., another boyfriend. By November 1998, Kelley had a new friend, who admitted to a history of domestic violence when speaking with the social worker. In addition, he apparently had some serious mental health issues and was prescribed several psychotropic medications. At that time, despite her statement to the social worker that she was prepared to cooperate with DCF, when the worker began to interview her CT Page 1443 friend, Kelley told him to "shut up" and stated "that is not how the game is played."
C. Events after the filing of the termination petitions on 11/98.
By November, 1998, after numerous attempts to reunify Kelley with her children, DCF determined to file the termination petitions. "DCF continued," the social worker stated, "to see [with Kelley] a lack of progress made in therapy and a lack of understanding of domestic violence and relationship issues and how those things affected her children." In September, 1998, in a last ditch attempt to see what could be done, DCF scheduled a team meeting between the social worker on Kelley's case and the various area service providers to see what could be done. Kelley attended late and eventually stormed out of the meeting, unwilling to participate and work with the various individual agencies, which had had contact with her through the years of DCF involvement with her life.
In 1999, Kelley's behavior became even more problematic than it had been earlier. She moved several times and there were several referrals involving her and her oldest child, Raymond, who had been returned to her care earlier. By May, 1999, he, too was removed from her care. The social worker testified as to his growing concerns about Kelley and her erratic behavior. In September, 1999, Kelley admitted to the social worker that she had been using cocaine for about six months and had acted as a runner in order to finance her addiction.
2. The fathers of Kelley B.'s four youngest children
A. Dale C., the biological father of Dale and Mark C.
Dale has not been involved in the life of his sons since 1995, when he left the State of Connecticut. In 1994, he admitted to alcohol abuse and received substance abuse treatment as a result of the DCF referral. By 1995, he had left the State and has not had contact with DCF or his sons since that time. He has not called to inquire about their well-being or progress, he had not had any visitation, he has sent no cards, letters or gifts nor has he paid any support for his sons. There is no question that he has abandoned them completely and the court so finds from the clear and convincing evidence. He has no relationship with his two sons. CT Page 1444
B. William McC., the biological father of William McC.
William McC. is the biological father of Kelley's child by the same name. He had a troubled early history and was physically and sexually abused in his family of origin. He left home as a young teenager and fended for himself. By age sixteen, he was involved in the juvenile court system and also has a lengthy adult criminal history. He and Kelley were involved in a relationship for about three years and lived together for eight months, until DCF learned of his criminal conviction of sexual assault of a minor. His relationship with Kelley was characterized by domestic violence. In addition, he was incarcerated for several years due to a conviction for sexual abuse of a minor. While on probation and under orders to have no contact with minor children, he became involved with Kelley and her children. He was arrested for violation of his probation on charges of sexual contact with a fifteen-year-old and was incarcerated from 1996 until June, 1998. Because of his record, he was told by DCF that he could not have visitation with his son. He had one supervised visit while incarcerated on September 11, 1997. No expectations were ever set for William. The social worker involved in the case at that time stated she did have a discussion with him about services he could utilize. She knew that there was individual counseling available to him.
In March, 1999, William McC. was evaluated by Dr. Derry. Dr. Derry saw William with his son. She testified as a result of her evaluation, she concluded that William was an "impulsive, pleasure seeking individual who had no compunction about varying reality to suit his purposes. He was anti-social and had troubled sexual associations and substance abuse issues in his life." He did not "acknowledge any difficulties and is therefore a poor prospect for treatment." She found that he was completely unprepared to care for his son. He had "no sense of the child as an individual and no awareness of his needs as a child." His plan was to have his son live with him and his girlfriend, her nineteen-year-old son and a fifty-year-old old disabled individual who is in the household. This person is partially paralyzed and suffers from a seizure disorder. He would be the person William chose to provide daytime care for his son. Dr. Derry concluded, "it is unlikely that it would ever be appropriate for William McC. to reside with his father, William McC. The kinds of difficulties and chronic antisocial lifestyle that Mr. McC. experiences are not amenable to treatment in any meaningful way."[3]
CT Page 1445
In the same month, Northeast Clinical Specialists performed a sexual offender evaluation. Prior to that time, William McC. had been receiving sexual offender treatment with a therapist at the same agency for a total of four and one-half years, but was discharged from treatment, as he did not stay away from minor children. Ronald D. Anderson, Ph. D, who evaluated William, concluded that he was at high risk for re-offending. He testified that Mr. McC. had "very weak parenting skills and . . . unrealistic expectations about the behavior of children." He concluded he was not an "adequate resource" as a primary parent. He found he had" limited problem solving skills and lack of knowledge of parenting techniques. He was authoritarian and punitive in the answers he proposed" to parenting questions. Finally, he noted that William "does not believe that he had a problem that warrants treatment." In his written report, he concluded "He may have legitimate concerns about the welfare of his son, but is not clear he will be able to become a primary care resource for the child for many years. Given the age of the child, William would be strongly advised to consider that an adoptive home might be found which could best meet his son's emotional and material needs."[4]
C. Samson D., the biological father of Samson D.
Samson D. is a native of Haiti and had been in the United States for some years prior to his involvement with Kelley B. Little is known of his early years. As previously detailed, he and Kelley were involved in a relationship characterized by domestic violence. He, like the other biological fathers of these four children, has a criminal record for including assault in the third degree for a domestic violence incident.[5] He was in and out of Kelley's home from March, 1996 until some time in the summer of 1997. In early May, 1997 he and Kelley had another domestic violence incident which ended in the police escorting him from the home. When he returned the next morning he began to fight with Kelley again and apparently hit her in the face in front of the children. This led to the arrest of both Kelley and Samson and led to the removal of all of the children in her household. At that time, young Samson was only a few months old. A protective order was issued which both he and Kelley violated in June when she permitted him to return to the house, By September, 1997, however, Kelley reported to her social worker that she was finished with Samson and "wanted a relationship with someone who did not beat her." CT Page 1446
It is from the reports of the children, Dale and Mark, when first placed in foster care that a picture of the reign of terror within the household while Samson was there emerges. Dale told his foster mother about all of the fighting, yelling and screaming in the house. He stated that it was "hard to breathe" when he got scared at home when things would happen. He also stated that he slept with a knife under his bed so that he could protect his mother. Mark reported soon after he was placed in foster care that Samson had hurt his head by hitting it on the floor and that Samson kicked him. Whatever the exact details of the day-to-day life while Samson was there, it left a lasting and harmful emotional impact on Dale and Mark C.
In the first few months after young Samson was removed from the home, his father had three or four supervised visits with his son. After that, he did not maintain contact with DCF and DCF did not again learn of his whereabouts until he was arrested for violation of his probation in the spring of 1998. After that period of time, he was evaluated and sent to Connecticut Valley Hospital, (CVH), given his psychiatric problems.
Samson D. was evaluated by Dr. Derry on January 12 and January 26, 1999. She stated she interviewed Samson at the hospital as he was adjudged by the hospital to be "a highly dangerous individual." She knew that he had been found incompetent to stand trial and that initially he was diagnosed as suffering from delusional disorder, which was later changed to paranoid schizophrenia. She found him to be delusional at that time as he asserted that "he had never been involved in any criminal activity and that he had no psychiatric history. The reason he was persecuted by the legal system was because he had rejected the sexual advances of a prosecuting attorney." She was not able to perform any testing for he was acutely psychotic at the time of her meetings with him. She found his report that he had no previous mental illness unlikely.
The interview included his son and she found his approach to his son "affectionate and tender." She stated "given his illness, the fact that the child was a stranger and that he is male, thought his approach to his son was particularly tender and sweet. He was delightful to him." She noted that the child appeared to have no memories of his father.
Despite her impression of their interaction, she stated that CT Page 1447 she had familiarity with persons who suffer from paranoid schizophrenia. In general, she stated that individuals with this diagnosis
 "tend to be less compliant with pharmacological and therapeutic treatment. The reason for this is that delusions frequently play a role in medication. In his case specifically, there is no evidence of any prior psychiatric care and he did not acknowledge a mental illness . . . or a need for medication . . . and also he refused medication throughout his stay at CVH until it was court-ordered. . . . It is highly likely that he will have difficulty sustaining compliance in an unsupervised situation sufficiently to function independently."
She had concerns about the child Samson being in his father's care. She stated that the father "has a consistent history of marginal functioning, — he has multiple arrests, substance abuse Superior Court and no stable employment history or history of stable living over a protracted period of time — in short, he does not have a history of competent functioning as an adult." She stated a change for young Samson from his present situation to the care of his father would be detrimental to this child.
Dr. Derry observed similarities among the three biological fathers of Kelley's four youngest children. As partners, Kelley chose "violent, irresponsible and self-absorbed individuals." She stated for the children that "their environment has encouraged an aggressive, under-socialized conflict resolution strategy." In her opinion, the children needed to know an adult male who functions without violence, substance abuse or exploitation of other people."
3. The four children, Dale and Mark C., William McC. and Samson D.
A. Dale and Mark C.
Dale C. was born on June 11, 1990 and is now nine years old. Mark was born on May 14, 1992 and is seven. These siblings were initially placed in separate homes because of their aggressive and sexualized behavior with each other. After some months, Mark was moved into the home where Dale had been placed. Until recently in August, 1999, Dale and Mark C. were together in the same foster home from May, 1997. They have done well there. Unfortunately, their former foster mother was required to leave the state and a new foster home was found for them with the CT Page 1448 assistance and recommendation of their therapist, Martha Roberts.
Their first foster mother testified about these two children. Both Dale and Mark suffered from developmental delays when first placed. Dale had to repeat kindergarten while in the care of his mother and continues to receive special education services to address speech and language problems and social and emotional delays. He has, however, shown dramatic improvement in the classroom.
When first placed, Dale also exhibited precocious sexualized behaviors, which included touching other people's genitals, initiating sexual play such as playing doctor or french kissing. Dale is also a "parentified child, feeling responsible for protecting his younger siblings", his social worker reported. His first foster mother reported that he was very withdrawn when she first came into her care. He had some night terrors and initially usually urinated at night into a laundry basket in the corner of his bedroom because he was afraid to leave the room for the bathroom. She stated that talking with him has helped to relieve some of his anxieties and after the initial adjustment period, he improved markedly. He needed "help to just be a little boy."
At present, Dale's new foster mother reported he has adjusted well. He is able to have telephone contact with his first foster mother and that has helped ease his transition in to his new home. Mark has also done well at his new home. The children have done well in school and are actively engaged in sports activities.
Mark, when first placed, the foster mother testified, was extraordinarily difficult to handle, for her as well as for the school officials. He threw tantrums regularly and screamed a lot. She noted that he was a very angry little boy. Over time, by use of various disciplining techniques, he began to calm down. He is very close to his older brother and the two have been a support for each other. She noted that initially when they had visits with their mother, they both did well. But as time went on, both boys began to act out before and after visits. They would be difficult and obnoxious and hide in the closet. When they came back, they also did not behave well.
Dr. Derry saw both boys most recently in a parent-child interaction session with their mother in January, 1999. Dr. Derry noted that Dale was afraid of his mother and generally very CT Page 1449 anxious when in her presence. "Dale", she stated "was quite open and did not want to go back to his mother. He stated that living with his mother was scary and he had to save his mother from Samson and . . . the beating she was getting." Mark was anxious and very tense. When told, she was coming, he stated "Oh, my gosh, is she coming in here?" When he was then affectionate with his mother, she berated him about his choice of gifts. Mark had asked for some beads, a Barbie Doll and a purse. She told him these were not the kinds of things a boy should want and Mark then began to sob, saying that he had never asked for these things and repeated how sorry he was.
Problems concerning Mark's image of himself had been explored with his therapist Martha Roberts. When younger, he had apparently thought of himself as female and has now accepted his sex. Prior to the interaction described, Kelley had been counseled to be more accepting of Mark's needs and desires, but was unable to take such steps without criticizing this child. When asked, Dr. Derry said that Kelley was not Dale's or Mark's psychological parent. About Dale, she stated that she was not sure he had one, possibly his foster mother. Mark, she noted, saw his brother Dale as his psychological parent and this underlined the importance of the siblings remaining together.
The boys' current foster mother also testified. The boys have been with her family since August, 1999. Dale is involved in sports and likes those activities. Academically, he is about two years behind and is getting special services with tutoring in reading and math. He likes school and his teacher. She noted that neither Mark nor Dale are able to amuse themselves independent of others and are very clingy with the adults around them. Dale is easily frustrated when he does not receive the help he needs.
Mark, his foster mother noted, is a very affectionate young man who can be contrary and oppositional. He, too, is getting help in reading and other tests are being done to see if he requires any additional help. Both boys have settled into their new home well and she and her family wish to adopt them if possible.
B. William McC. and Samson D.
The two younger half-siblings have been placed together as well. They have lived with the same foster family for almost three years. The foster mother reported that Samson, who is two, is "very independent, very intelligent and knows what he wants. CT Page 1450 He verbally lets you know as his vocabulary is excellent." He has no developmental problems, he tries to help her around the house and is very cooperative. William is "very lovable and will do anything to help you out." He is four years old and has had chronic ear infections. Since his surgery, his hearing and speech have improved and he is receiving speech therapy in school. He attends preschool four days a week for three hours a day and receives no other special services. She and her husband would like to adopt these boys, if possible. She noted that they have become as much a part of her family as the other children are.
 B. ADJUDICATION 1. Reasonable Reunification Efforts
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, provided that this finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." Connecticut General Statutes § 17a-112 (c)(1). The court made such findings on June 8, 1999. (Mack, J.) The court does find, from the clear and convincing evidence, that reasonable reunification efforts had been made prior to the date of this finding. Such efforts were hampered by Kelley's unwillingness to benefit from services and her lack of participation and cooperation with DCF, Dale C.'s unavailability, William McC.'s unwillingness to complete sexual offender counseling and Samson D.'s lack of cooperation and participation.
2. Adjudicatory Findings
A. Kelley B.
On June 27, 1997, all four children were adjudicated neglected and committed to the care and custody of DCF for a period of twelve months. Their commitment has been extended since that time. The court further finds, by clear and convincing evidence, that as of November 17, 1998, Kelley had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in his life. Connecticut General Statutes § 17a-112 (c)(3)(B). ""Personal CT Page 1451 rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532
(1986), see also; In re Juvenile Appeal, 1 Conn. App. 463, 477,473 A.2d 795 (1984). The court concludes Kelley's lack of rehabilitation only became more obvious after the filing of the termination petition and that there is no prospect that she will be rehabilitated within the foreseeable future. Given the long period of time DCF worked with her, first by providing her with protective supervision and services in the home and then with extensive services after the children were removed, Kelley will not become rehabilitated soon, if ever. Both her abject failure as a parent and her inability to rehabilitate herself highlights the fact that giving her the benefit of the doubt so many times only prolonged the limbo in which all of the children found themselves. The long period of time efforts were made for their mother without any resolution for them continued to contribute to their emotional difficulties.
The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis C.,210 Conn. 157, 1167, 554 A.2d 722 (1989), In re Hector L.,53 Conn. App. 359, 366-367, ___ A.2d ___ (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petitions, the court must consider not only Kelley's conduct prior to the filing of those petitions, but also her conduct after that time. In this case, this was a period of slightly more than one year, during which time Kelley made no progress.
B. William McC.
William McC. has also failed to rehabilitate himself as a parent as of November 17, 1998. The court finds from the clear and convincing evidence that he failed to deal with his sexual offender issues by not completing his program of sexual offender counseling. As stated by Dr. Anderson, he remains at high risk of offending again and has no insight into his difficulties. He, like Kelley, is unlikely to become rehabilitated within a period of time that is reasonable, given the age and needs of his child. His counsel argues that DCF did not provide William with an opportunity to reunify and that they needed to provide services to him to do so properly. The court finds, however, that CT Page 1452 rehabilitative services are not required to be offered by DCF in a vacuum. William McC., if he wished to begin the steps necessary to rehabilitate himself as a parent, most clearly needed to address his deviant sexual behavior. Only after he had done this successfully, would it be safe to permit any children, including his own, to be in his care. This very fundamental step he refused to do and continues not to do. He lacks, as Dr. Anderson testified, a sense of the proper sexual boundaries between adults and children and has no insight into his behavior. It is not the mere fact of his conviction for sexual abuse that is the issue, as argued by counsel, but the underlying behavior which occasioned the offense in the first place that is of grave concern. DCF, the court finds, was not required to provide something other than this very fundamental referral. The court cannot and does not conclude that William McC. tried to the best of his ability to rehabilitate. He tried only so much as suited him under the circumstances and no more. He has gained no insight into his troubled past and the problems still facing him.
C. Dale C.
The court has previously found, by clear and convincing evidence, that as of November 17, 1998, Dale C. had abandoned his two children, Dale and Mark C. "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re JuvenileAppeal (Docket No. 9489), 183 Conn. 11, 14, 438 A.2d 801 (1981). Dale C. simply was never involved in the lives of these children and left that state on at least two occasions and now remains in West Virginia. The termination petition also alleges that there is no ongoing parent-child relationship between Dale C. and his two sons, Dale and Mark, and to allow further time for the development of such a relationship would be detrimental to the best interests of the child. Connecticut General Statutes §17a-112 (c)(3)(D). The court so concludes from the clear and convincing evidence.
C. Samson D.
For different reasons, Samson D. has abandoned his son, Samson and also lacks an ongoing-parent-child relationship with him. He had no contact with the child and DCF for many months. Upon his re-arrest and incarceration, he was located again but has not been able to develop any relationship with his son, who has no CT Page 1453 memories of him. While he has maintained a stable existence in a supported environment where aides provide him with medication and loose supervision, he is not yet in the community in an unsupervised setting. Given the severity of his mental illness, the expert who testified does not believe it to be possible for him to maintain himself within the community unassisted. The court is persuaded by this testimony. The court concludes, from the clear and convincing evidence, that he has abandoned the child in the legal meaning of the statute and that there is no ongoing-parent child relationship between them. To permit further time for the development of such a relationship would be detrimental to his son, who requires permanency in his life soon.
 C. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e):
1) Appropriate and timely services were provided by DCF to the family. The services include services to benefit the children, referrals for Kelley to deal with issues of domestic violence, parenting and most recently substance abuse. DCF also provided visitation and case management services as well as services to William McC. and Samson D. Dale C. was not available to receive any services.
2) As previously noted, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family, until the order that further efforts were not required on June 8, 1999.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations were set for Kelley and she was not able to even minimally fulfill them. None were set for the biological fathers as they did not begin to minimally comply with the beginning referrals required of them. Neither Samson D. nor Dale C. made themselves available to DCF.
4) The feelings and emotional ties of the children with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the children for at least one year and with whom the children have developed significant emotional ties. The two older children have only CT Page 1454 negative memories of their mother and do not wish to have contact with her. There is no ongoing parent child relationship between Dale and Mark C. and their biological mother or father. They are developing a comfortable relationship with their new foster parents, who wish to adopt them. While that relationship is less than one year old, their earlier relationship with their previous foster parents continued for several years and they were close to them. William Mc. has negative memories of his mother and Samson no longer retains any such memories, as he was very young when removed from the home. The two youngest children also have close ties to their foster family, with whom they have resided for several years.
5) Finding regarding the ages of the children: Dale C. is nine years old and will be ten on July 11, 2000. Mark C. is seven years old and will be eight on May 14, 2000. William McC. is four years old and will be five on July 1, 2000. Samson D. is two and will be three years old on March 31, 2000.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the children as part of an effort to reunite the children with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. As detailed above, the court finds that none of the parents has made any changes in their lives to accommodate the care and nurturing of these children. Kelley and William McC. have not rehabilitated themselves so that they could resume a responsible position in the lives of the children and Dale C. and Samson D. have abandoned their children.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the children by the unreasonable act or conduct of the other parent of the children, or the unreasonable act of any other person or by the economic circumstances of the parent. No such conduct is noted. DCF has taken many steps for many years to encourage Kelley to have a meaningful relationship with her children and to rehabilitate herself, which she has been unable to accomplish. Further, no such conduct is noted as to the biological fathers of these four children. CT Page 1455
 D. DISPOSITION
The court concludes, from the clear and convincing evidence, that there is no biological parent ready now or in the foreseeable future, who will be able to care for any of these children. The court concludes, from the clear and convincing testimony, that it is in the best interests of the children to be permitted to have permanency and stability in their lives. Towards that end, the court concludes that it is in the best interests of all of the children that their parents' rights to them be terminated. Our courts have noted the "deleterious effect of prolonged temporary care of abused and neglected children." Inre Juvenile Appeal (84-CD), 189 Conn. 276, 455 A.2d 1313 (1983). In addition, "[because of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V., 25 Conn. App. 741, 748,596 A.2d 930 (1992).
Based upon the foregoing, the court finds that it is in the best interests of Dale and Mark C., William McC. and Samson D. that Kelley B.'s rights to them be terminated. The court further concludes that it is in the best interests of Mark and Dale C., that the rights of Dale C. to them be terminated. The court further finds, from the clear and convincing evidence, that it is in the best interests of William McC. that the rights of his biological father, William McC., be terminated. The court also concludes that this is in the best interests of Samson D. that the rights of his biological father, Samson D., be terminated. The court therefore orders that a termination of parental rights enter with respect to Kelley B., Dale C., William McC. and Samson D. Given that each of the foster parents has expressed a desire to adopt the children in their care, the court directs that they be given first consideration in any adoption. The court further orders that a permanency plan for the children be submitted within sixty days. A review plan for the children shall be filed in accordance with state and federal law.
Barbara M. Quinn, Presiding Judge Child Protection Session